# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| JERRY L. DEPAUW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-cv-1161 |
| | ) | |
| INGERSOLL-RAND, | ) | |
| | ) | |
| Defendant. | ) | |

## O R D E R

Before the Court are the Motion for Summary Judgment filed by Defendant, Ingersoll-Rand, on July 1, 2007 [Doc. 27] and the Motion to Strike filed by Defendant on August 6, 2007 [Doc. 31]. For the reasons that follow, the Motion for Summary Judgment is GRANTED and the Motion to Strike is GRANTED IN PART.

### UNDISPUTED FACTS[1]

Jerry L. DePauw, Plaintiff, was a 20-year employee of Defendant Ingersoll-Rand Company and worked in the Security

---

[1] Plaintiff failed to comply with Local Rule 7.1(D) in the designation of material facts that are undisputed and disputed. Rather than designate which of Defendant's material facts he agreed with, disputed, or otherwise believed were immaterial, Plaintiff simply lists his own undisputed and disputed material facts without reference to Defendant's list. Such a procedure is unhelpful to the Court. The purpose of the Local Rule is to congregate those facts that are in dispute in a manner that is easily referenced. Plaintiff's brief does not accomplish this goal. The Court, therefore, will accept all facts as stated by Defendant unless specifically refuted by Plaintiff with the necessary documentation. Flaherty v. Gas Research Institute, 31 F.3d 451, 453 (7th Cir. 1994).

Technologies Sector (referred by the parties as "LCN") at the Princeton, Illinois plant.  On March 7, 2005, Plaintiff's employment was terminated.  Plaintiff believes that he was fired because of his age and sought relief from the Equal Employment Opportunity Commission (EEOC).  Plaintiff subsequently received a Right to Sue letter and filed suit on June 26, 2006, alleging that Defendant violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.*  Defendant answers that Plaintiff was terminated because he failed to meet their expectations and not on account of his age.

During the relevant time period, Plaintiff worked the "shell line" at the Princeton plant as a machine operator on the first shift.  The LCN manufactured cylindrical iron door closers for commercial doors and the various machines created various parts used in the door closers.  Plaintiff was capable of operating most of these machines along with other personnel in the LCN; although, each machine was usually operated by the person most familiar with the machine.  At the time, Plaintiff primarily operated the DM624 and the 596 machines (collectively referred to as the DM624/596).

Plaintiff's co-workers included Marcel Hart, Brandon Smith, Jim Giomencetti, Seth Hansen, Jerry Coughlin, John Lungren, Joel McComber, Ed Nissen, and others.  The lead person on Plaintiff's team was Greg Guthrie.  The team leader of the first shift was

Terry Clark.  Guthrie reported to Clark and was in charge when Clark was absent.  Both Guthrie and Clark reported to Timothy Farraher, the focus factory manager.  Farraher in turn reported to John Schostek, the general manager. On the human resources side, Karen Russell was the employee relations manager and reported to Kristi Compton, the human resources manager. Compton, in turn, reported to Dan Long, the human resources director.

Each of the machines operated by Plaintiff and his co-workers produced dozens of parts per hour.  As with most factories that generate a product, Defendant maintained a defective parts and quality assurance policy.  Thus, in addition to operating the machinery, the employees were expected to perform quality checks at varying intervals.  For example, the DM624/596 (the machine operated by Plaintiff) produced about 150 to 180 parts per hour.  Operators of the machine were expected to conduct quality checks every 75-90 parts.  According to Defendant, employees were not disciplined for producing defective parts which are identified during a quality check; rather, they were disciplined for failing to catch defective parts that should have been identified in quality checks.  If an operator failed in this duty, he was issued a Corrective Action Report (hereinafter "CAR") – which is also used for other infractions.  Four CARs within a year resulted in termination.

3

Plaintiff received his first CAR on April 17, 2003 from Farraher.  On that date, 1,800 defectives parts were produced by the DM624/596 machine.  Plaintiff was one of three operators of the machine.  Farraher could not determine which of the operators actually failed to conduct the proper quality checks.  As a result all three operators (Giomencetti, Hansen, and Plaintiff) were issued a CAR.

Plaintiff received his second CAR on March 5, 2004.  On that date, Plaintiff was assisting his co-worker Coughlin in operating a machine.  Plaintiff did the initial set-up of the machine.  The machine ran defective parts.  According to Farraher, Plaintiff admitted to running the defective parts and Farraher directed Clark to issue him a CAR.

Plaintiff received his third and fourth CARs on March 18, 2004 and May 24, 2004, respectively.  There appears to be no dispute that these CARs were rightly issued to Plaintiff for failing to perform quality checks.  After the May 24, 2004 CAR, (which would subject Plaintiff to termination), Farraher, Clark, Russell, Compton, and Schostek decided to give Plaintiff another chance in light of his seniority and because the first CAR was "directed to group conduct."  Thus, Farraher and Russell discussed with Plaintiff that with one more CAR he would be terminated.

4

Plaintiff's fifth and final CAR was issued on March 7, 2005.
Defendant determined that on February 24, 2005, a number of
defective parts were generated on the DM624/596 machine which
Plaintiff was running.  Specifically, 94 consecutive defective
parts were run which should have been caught in a quality check.
Plaintiff's employment was terminated as a result on March 7,
2005.

Discovery revealed that Plaintiff applied for disability
benefits from the Social Security Administration after he was
terminated.  In the application for disability benefits,
Plaintiff indicated that he became disabled on the same day that
he was fired – March 7, 2005.  On November 21, 2006, an
Administrative Law Judge determined that Plaintiff was disabled
as of March 7, 2005, due to bilateral hip replacement and
degenerative joint disease of the spine.  Plaintiff subsequently
was awarded benefits from September, 2005, and is apparently
still receiving benefits.  The Social Security Administration
explained in a Notice of Award that while Plaintiff's onset date
is March 7, 2005, he is not entitled to benefits from that date
because regulations require that he be disabled for five calendar
months in a row before he is entitled to benefits.

## STANDARD

Summary judgment should be granted where "the pleadings,
depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(c). The moving party has the responsibility of informing the
Court as to portions of the record that demonstrate the absence
of a genuine issue of material fact. Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986). The movant may meet this burden by
demonstrating "that there is an absence of evidence to support
the nonmoving party's case." Id. at 325.

Once the movant has met its burden, to survive summary
judgment the "nonmovant must show through specific evidence that
a triable issue of fact remains on issues on which [s]he bears
the burden of proof at trial." Warsco v. Preferred Tech. Group,
258 F.3d 557, 563 (7th Cir. 2001); See also Celotex Corp., 477
U.S. at 322-24. "The nonmovant may not rest upon mere
allegations in the pleadings or upon conclusory statements in
affidavits; it must go beyond the pleadings and support its
contentions with proper documentary evidence." Chemsource, Inc.
v. Hub Group, Inc., 106 F.3d 1358, 1361 (7th Cir. 1997).

This Court must nonetheless "view the record and all
inferences drawn from it in the light most favorable to the [non-
moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883
F.2d 1307, 1312 (7th Cir. 1989). In doing so, this Court is not
"required to draw every conceivable inference from the record --

6

only those inferences that are reasonable." <u>Bank Leumi Le-</u>
<u>Isreal, B.M. v. Lee</u>, 928 F.2d 232, 236 (7th Cir. 1991).

Therefore, if the record before the court "could not lead a
rational trier of fact to find for the non-moving party," then no
genuine issue of material fact exists and the moving party is
entitled to judgment as a matter of law. <u>McClendon v. Indiana</u>
<u>Sugars, Inc.</u>, 108 F.3d 789, 796 (7th Cir. 1997) (quoting
<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,
587 (1986)). However, in ruling on a motion for summary
judgment, the court may not weigh the evidence or resolve issues
of fact; disputed facts must be left for resolution at trial.
<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986).

## <u>ANALYSIS</u>

The ADEA makes it "unlawful for an employer . . . to fail or
refuse to hire or to discharge any individual or otherwise
discriminate against any individual with respect to his
compensation, terms, conditions, or privileges of employment,
because of such individual's age." 29 U.S.C. § 623(a)(1). When
a plaintiff alleges age discrimination, "'liability depends on
whether the protected trait (under the ADEA, age) actually
motivated the employer's decision.'" <u>Reeves v. Sanderson</u>
<u>Plumbing Products Inc.</u>, 530 U.S. 133, 141 (2000) (<u>quoting</u> <u>Hazen</u>
<u>Paper Co. v. Biggins</u>, 507 U.S. 604, 610 (1993)). In other words,
the plaintiff's age must have "'actually played a role in [the

7

employer's decision making] process and had a determinative influence on the outcome.'" Id.; See also Hemsworth v. Quotesmith.Com, Inc., 476 F.3d 487, 490 (7th Cir. 2007).

A plaintiff may prove intentional age discrimination directly, through direct or circumstantial evidence, or indirectly through the familiar burden-shifting method enunciated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Luks v. Baxter Healthcare Corp., 467 F.3d 1049, 1053 (7th Cir. 2006); Grimm v. Alro Steel Corporation, 410 F.3d 383, 385 (7th Cir. 2005).  Here, Plaintiff presents no direct evidence, like admissions from his employer that he was being terminated because of his age, nor does he create a mosaic of circumstantial evidence that would lead a jury to believe that he was discriminated against becuase of his age.  Luks, 467 F.3d at 1053.  Plaintiff relies solely upon the indirect method to establish Defendant's discriminatory intent.

In order to proceed under the indirect burden shifting method, Plaintiff must first make out a *prima facie* case of discrimination.  Id.  Plaintiff must show that he is a member of the protected class, that he was meeting his employer's legitimate expectations, that he was terminated, and that similarly situated persons were treated more favorably.  See Hemsworth, 476 F.3d at 492.  Once Plaintiff has established his *prima facie* case, Defendant must produce a legitimate non-

8

discriminatory reason for the employment decision.  Id.  If the defendant can offer such a reason, the burden then shifts back to Plaintiff to prove Defendant's reason is merely a pretext for discrimination.  Id.  To show pretext, Plaintiff must do more than show that Defendant's decision was mistaken or foolish, he must show that Defendant did not honestly believe in the reasons offered.  Kodl v. Board of Educ. School Dist. 45, Villa Park, 490 F.3d 558, 562 (7th Cir. 2007); Ptasznik v. St. Joseph Hosp., 464 F.3d 691, 696 (7th Cir. 2006).

However, before Defendant's motivations are analyzed, it first must be determined whether Plaintiff is judicially estopped from bringing his ADEA claim in light of his pursuit of disability benefits.  Defendant argues that because Plaintiff alleged before the Social Security Administration (SSA) that he was disabled and incapable of working on March 7, 2005, he cannot show that he was meeting its legitimate employment expectations. Defendant further asserts that Plaintiff can recover no damages as a result of his termination as back pay and front pay are precluded by his disability claim.  Id.  Plaintiff, on the other hand, argues that merely because he applied for and received disability benefits does not automatically exclude him from seeking relief pursuant to the ADEA.  He further argues that, at the very least, he is entitled to damages from March, 2005 to

September, 2005 – the period within which he received no benefits
from the SSA.

Defendant's first argument goes to prong two of Plaintiff's
*prima facie* case: whether he was meeting his employer's
expectations.  That is, whether Plaintiff, by asserting he is
disabled, was capable of performing his job.  The equitable
doctrine of judicial estoppel is designed to prevent a party from
prevailing in two different arenas based on contradictory
arguments.  Zedner v. United States, 126 S.Ct. 1976, 1988 (2006).
Thus, "[w]here a party assumes a certain position in a legal
proceeding, and succeeds in maintaining that position, he may not
thereafter, simply because his interests have changed, assume a
contrary position, especially if it be to the prejudice of the
party who has acquiesced in the position formerly taken by him."
Id. (internal quotation marks, editing marks, and citations
omitted); Reynolds v. City of Chicago, 296 F.3d 524, 528-529 (7th
Cir. 2002) (noting that judicial estoppel, "which to discourage
fraud in the litigation process bars a litigant who has obtained
a judgment on the basis of proving one set of facts from
obtaining a second judgment by turning around and proving that
the facts were actually the opposite of what he had proved in the
prior case").  The Court may invoke this doctrine at its
discretion.  New Hampsire v. Maine, 532 U.S. 742, 750 (2001).

Several factors are considered in determining whether judicial estoppel should be invoked, including, but not limited to:

> First, a party's later position must be "clearly inconsistent" with its earlier position.  Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.  Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity.  A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

Id. (internal quotation marks and citations omitted).

See also Commonwealth Insurance Company v. Titan Tire Corp., 398 F.3d 879, 887 (7th Cir. 2004) ("As judicial estoppel is an equitable concept, our law in this area is flexible.  While there are boundaries, there is not a rigid set of rules to be enforced.").  The Court must consider whether equities favor granting judgment to Defendant.

Judicial estoppel may be invoked in a situation where the prior decision is the result of an administrative proceeding and the later suit takes place in a court.  Thus, in Cleveland v. Policy Management Systems Corporation, 526 U.S. 795 (1999), the Supreme Court applied the doctrine where an administrative proceeding resulted in an award of disability benefits to a plaintiff who later filed suit pursuant to the Americans with

Disabilities Act (ADA).  In that case, the plaintiff, who was
employed at the time, suffered a stroke and subsequently filed
for disability claiming that she was unable to work.  Her
condition improved, she returned to work, and informed the SSA of
her new condition.  The SSA subsequently denied her application;
however, shortly thereafter, Plaintiff was fired.  She asked the
SSA to reconsider stating that she was fired because her employer
indicated that she no longer could do her job in light of her
condition.  The SSA initially denied her application; however,
upon the presentment of new evidence, granted her benefits.
Plaintiff then brought an ADA suit against her employer.  The
Supreme Court stated that, while the awarding of disability
benefits does not necessarily preclude an ADA suit nor create a
presumption in favor of defendant,

> a plaintiff's sworn assertion in an application for
> disability benefits that she is, for example, 'unable
> to work' will appear to negate an essential element of
> her ADA case – at least if she does not offer a
> sufficient explanation.  For that reason, we hold that
> an ADA plaintiff cannot simply ignore the apparent
> contradiction that arises out of the earlier SSDI total
> disability claim.  Rather, she must proffer a
> sufficient explanation.

> Id. at 806.

The Court concluded that plaintiff should be able to account for
the discrepancy between her claims of total disability and her
assertion that she could work with a reasonable accommodation.

In <u>Lee v. City of Salem, Indiana,</u> 259 F.3d 667 (7th Cir. 2001), the Seventh Circuit applied this principle and found that the plaintiff's proffered excuse was insufficient.  In that case, a cemetery sexton was injured and subsequently fired from his job after his employer determined he could not perform the essential functions of his job with or without accommodation.  Plaintiff then filed for disability alleging his termination date as the onset date of his disability.  The matter went to a jury which nonetheless found for plaintiff and awarded him damages.  At trial, plaintiff offered testimony which attempted to explain why he applied for disability benefits and whether he was capable of performing his job.  The Seventh Circuit noted that:

> To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement [of disability], the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'

<u>Id.</u> at 674 (citing <u>Cleveland</u> 526 U.S. at 807).

The Court found, that plaintiff's explanation was insufficient: "The unmistakable import of Lee's post-termination application for disability benefits is that he was unable to continue working as a cemetery sexton." <u>Id.</u> at 675.  Thus, as the plaintiff was unable to reconcile his two positions, judgment for the defendant was appropriate.

13

Of course, in the case at bar, Plaintiff is asserting an ADEA claim, not an ADA claim.[2]  Thus, there is no occasion to determine whether Plaintiff's claim of disability is inconsistent with an assessment that he could work with a reasonable accommodation – these are not factors in an ADEA claim.  However, what is a factor is whether Plaintiff met Defendant's legitimate job expectations.  See Olson v. Northern FS, Inc., 387 F.3d 632, 635 (7th Cir. 2004).  In Johnson v. ExxonMobil Corporation, 426 F.3d 887 (7th Cir. 2005), the Seventh Circuit addressed this very issue.  Gordon Johnson brought both an ADA and an ADEA claim against his employer claiming that he was terminated because he suffers from epilepsy and because of his age.  As of the date that Johnson was fired, March 14, 2002, he claimed before the SSA in an application for disability benefits that he became "'unable to work because of [his] disabling condition.'"  Id. at 890.  To explain the inconsistency between his claim for disability benefits and his ADA claim, Johnson stated that:

---

[2] In his brief, Plaintiff spends a significant amount of time outlining Plaintiff's medical conditions and concludes that Defendant "desires to keep quiet the fact that DePauw sacrificed his body for Defendant for twenty years and Defendant discarded DePauw once DePauw became too old and potentially costly (via potential workers' compensation cases by DePauw or the other machine operators due to the repeated vibration)."  Such hyperbole is unhelpful in this ADEA claim.  There is no claim under the ADA and no worker's compensation claim before the Court.

> His condition worsened shortly after he was fired,
> rendering him unable to work, that the application was
> completed a year after his total disability, and that
> [he] had not filled out the application himself.
> <u>Id.</u> at 890.

The Court, construing these excuses as an indication that Johnson

was merely mistaken, found these excuses insufficient.   <u>Id.</u> at

892.   Thus, the Court found that Johnson was estopped from

pursuing his ADA claim.

> The Court's treatment of Johnson's ADEA claim was brief:
>
> The SSDI application also created problems for
> Johnson's ADEA claim.  In order to establish a *prima
> facie* case under the ADEA utilizing the indirect burden
> shifting method, a plaintiff must show that he is
> performing to the employer's legitimate expectations.
> This standard is even harder to meet than that of the
> ADA, which requires the employer to provide 'reasonable
> accommodation.'  Johnson's statement on his SSDI
> application that he was unable to work facially
> contradicted any claim that he was performing to his
> employer's legitimate expectations.
>
> <u>Id.</u> at 892-893 (citations omitted).

With this conclusion, the Seventh Circuit indicated that it was

proper for the district court to grant defendant judgment.

In the case at bar, Plaintiff argues that none of his

supervisors, on the date that he was fired, believed that he was

incapable of performing his job.  Plaintiff then goes through

medical records which the SSA used to initially deny his claim

for disability.  Plaintiff then implies that it was the SSA

which, presumably without input from Plaintiff, decided to use

the March 7, 2005 date as his onset date.  Plaintiff further

states that "[a]t no time did DePauw state that he stopped
working for Defendant because he was disabled, as of March 7,
2005, as Defendant contends." (Pl. Resp. p. 21). Plaintiff
concludes:

> DePauw informed the SSA that he was not working because
> he was 'fired.' DePauw never hid the ball on the SSA.
> Additionally, the medical records indicate DePauw's
> condition was degenerative, meaning worsening over
> time. Thus as of March 7, 2005, DePauw was capable of
> performing his job duties, but the time that ensued
> since his termination resulted in a degeneration of his
> condition, leaving him now disabled.
>
> (Pl. Resp. p. 22-23).

Plaintiff's arguments are unavailing. At no point does Plaintiff
point to evidence in which Plaintiff, himself, indicated that the
March 7, 2005 date was erroneous. In fact, at every step of his
disability claim and before this Court, Plaintiff affirms the
correctness of that date.

The undisputed evidence reveals that in his application for
disability benefits, Plaintiff indicated that he "became unable
to work because of [his] illnesses, injuries, or conditions" on
March 7, 2005. (Pl. Ex. N, p. 2). At no point during the
disability determination did Plaintiff indicate that this date
was in error. In fact, when the SSA initially denied his
application, Plaintiff affirmatively pursued his claim by seeking
review before an Administrative Law Judge (ALJ). The

ALJ issued a one page bench decision again indicating an onset
date of March 7, 2005 and finding that Plaintiff was entitled to
benefits.  In the hearing before the ALJ, Plaintiff sat through
argument by his attorney who essentially indicated that
Plaintiff's "clouded desire" to return to work is "unrealistic"
in light of his disability.  (Def. Reply Ex. E, p. 4-5).
Plaintiff further did not object when the ALJ indicated that
Plaintiff could not perform his past job (which was classified as
medium work) as he was only capable of light work.  Finally,
Plaintiff did not object when the ALJ indicated that he "met the
disability insurance status requirement of the Social Security
Act on March 7, 2005" and when he held that Plaintiff was
disabled since March 7, 2005.  (Def. Reply Ex. E, p. 10-11).

Before this Court, Plaintiff admitted that:

1.  " . . . DePauw represented to the Social Security
Administration ("SSA") that he has not, since on or
about March 7, 2005, been able to perform work similar
to the work he performed at Ingersoll-Rand."

2.  "DePauw has not, since on or about March 7, 2005,
been able to perform work similar to the work he
performed at Ingersoll-Rand."

3.  "In the process of seeking social security
disability benefits, DePauw (and/or his attorney or
another agent acting on DePauw's behalf), represented
to the SSA that DePauw's disability prevents him for
[sic] working in machine-operator type jobs."

4.  "DePauw has been unable to work because of illness,
injury or other conditions since on or about March 7,
2005."

17

(Def. Ex. C, ¶¶ 2, 9, 19, 18).[3]

Plaintiff's declaration, in which he asserts that he did not intend to apply for disability on March 7, 2005 and that he wanted to continue working for Defendant, facially contradicts his admissions and his representations to the SSA.  It is inconsistent to assert in his SSA application that his onset date was March 7, 2005, to admit that he was disabled since March 7, 2005, and then still assert the he was capable of performing his job.  Either Plaintiff was untruthful before the SSA or he is being untruthful before this Court.  Either way, Plaintiff cannot benefit in this lawsuit as it would be inconsistent with his SSA award.  Plaintiff's representation that he was disabled and could not perform his job necessarily means that he was not and could not meet his employer's legitimate expectations.  For this reason alone, pursuant to Johnson, Defendant is entitled to summary judgment on Plaintiff's ADEA claim.

Even if Plaintiff's claim was still viable notwithstanding his admissions and statements to the SSA, his claim still would fail.  As part of is *prima facie* burden, Plaintiff must present evidence that a similarly situated younger person was treated more favorably.  Plaintiff asserts that he was "replaced by a

---

[3] DePauw further admitted that his statements to the SSA were made under penalty of perjury and that he completed his application truthfully.

less expensive, younger, temporary employee" but provides no citation to the record to support this contention.  (Pl. Resp. p. 6); See Corley v. Rosewood Care Center, Inc., of Peoria, 388 F.3d 990, 1001 (7th Cir. 2004) (noting that the Court is not required to root through the record to find support for a litigants arguments).  Plaintiff then asserts that his co-worker Coughlin should have been assessed a CAR for the March 5, 2004 incident but was not.[4]  But Plaintiff points to no evidence that Coughlin was similarly situated to Plaintiff in all material respects.  Raymond v. Ameritech Corp., 442 F.3d 600, 610 (7th Cir. 2006) ("Employees are similarly situated if they are directly comparable in all material respects.").  Plaintiff next states, that Seth Hanson was treated differently.  Again, there is no argument or evidence that Hanson was similarly situated.[5]

---

[4] Plaintiff also generally argues that no employee was disciplined even though the LCN produced thousands of defective parts.  This argument and related facts are irrelevant.  It is undisputed that employees were not disciplined for *producing* defective parts.  They were only disciplined for failing to *check* for defective parts.  Therefore, the sheer number of defective parts generated offers no insight into whether there was a failure to check for defective parts.

[5] In his declaration, Plaintiff states that Hanson was not disciplined for failing to check oil levels on his machine, that he was not disciplined for violating company policy by chewing tobacco, and that he was not disciplined for operating a forklift without a license.  While all of this may be accurate, Plaintiff still provided no evidence that Hanson was comparable to him except by stating that he was a "co-worker."  Such a designation is insufficient as it fails to establish that Hanson was comparable to Plaintiff in all material respects.

Indeed, Plaintiff's brief does not even include a section on the similarly situated element of his *prima facie* case even though his brief contains subsections related to the other elements. Plaintiff simply highlights two individuals and seemingly expects the Court to construct his arguments for him – that is not the Court's province.  United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").  For this second reason, Plaintiff's ADEA claim must fail.

### MOTION TO STRIKE

In addition to filing a Motion for Summary Judgment, Defendant seeks to strike portions of DePauw's declaration which are either unsupported by the record or which contradict prior testimony.  Plaintiff has failed to respond to this motion. Prusuant to Local Rule 7.1(B)(2), the Court presumes that Plaintiff does not oppose the Motion or the arguments made therein.

Paragraphs 29, 44, 46, 67, 75, and 79 of Plaintiff's declaration are stricken as they directly or impliedly contradict his prior deposition testimony or admissions.  Pourghoraishi v. Flying J, Inc., 449 F.3d 751, 758-759 (7th Cir. 2006) ("A plaintiff cannot, however, create an issue of material fact by submitting an affidavit that contradicts an earlier deposition.").  Particularly, paragraph 75 of the declaration, in

which Plaintiff states that he was physically able to perform his job on March 7, 2005, contradicts Plaintiff's admission that he was unable to perform his job because of his disability (as noted above).  Higgins v. Mississippi, 217 F.3d 951, 955 (7th Cir. 2000).

Paragraphs 9, 47, and 50 shall be stricken as there is no indication that Plaintiff had personal knowledge as to what Clark may have done or what Clark and Farraher knew.  The Court finds, however, that while paragraphs 10, 23, 24, 54 and 73 are vague, they appear to be based on personal knowledge and will not be stricken.  Paragraphs 69 and 71 are frankly irrelevant. Plaintiff merely states that he disagreed with his performance evaluations.

Paragraphs 33, 34, 51, 55, and 82 are pure conjecture and are unsupported by the record.  Weeks v. Samsung Heavy Industries, Co., Ltd., 126 F.3d 926, 939 (7th Cir. 1997) ("As we have repeatedly explained, a plaintiff's own uncorroborated testimony is insufficient to defeat a motion for summary judgment.").  Plaintiff's beliefs are not the type of information that should be contained in a Rule 56(e) affidavit which must set forth facts.

Defendant's remaining arguments, that Plaintiff's statement of facts in his response to the Motion for Summary Judgment

contradict the evidence, have been addressed in large measure above.

<u>C<small>ONCLUSION</small></u>

For the foregoing reasons, the Motion for Summary Judgment filed by Defendant, Ingersoll-Rand, on July 1, 2007 is GRANTED [Doc. 27] and the Motion to Strike filed by Defendant on August 6, 2007 is GRANTED IN PART [Doc. 31].  Paragraphs 9, 34, 44, 46, 47, 50, 51, 55, 67, 69, 71, 75, 79, and 82 of Plaintiff's Declaration are hereby STRICKEN.  Clerk is directed to enter judgment in favor of Defendant and against Plaintiff.

CASE TERMINATED.


Entered this  _9th_  day of October, 2007

s/Joe B. McDade<br>
—————————————————<br>
JOE BILLY McDADE<br>
United States District Judge